# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

LISA DITTY and CHARLOTTE PETERSON,

          Plaintiffs,                **Memorandum of Law and Order**

v.                               Civ. No. 11-109 (MJD/FLN)

THE CITY OF MINNEAPOLIS,

          Defendant.

R. Daniel Rasmus and Richard E. Student, Rasmus Law Office, LLC, Counsel for Plaintiffs.

C. Lynne Fundingsland and Darla J. Boggs, Minneapolis City Attorney's Office, Counsel for Defendant.

## I. Introduction

This matter is before the Court on Defendant City of Minneapolis's Motion for Summary Judgment. [Docket No. 12.] The Court heard oral argument on April 20, 2012.

## II. Background

### A. Plaintiffs

Plaintiffs Lisa Ditty and Charlotte Peterson are both long-time employees of Defendant City of Minneapolis ("the City"). Peterson began work with the

City in 1987 and Peterson began in 1989. Both Plaintiffs held several different jobs in the course of their careers with the City. Relevant to the instant suit they both held the position of "Project Coordinator" in the City's "Business Information Services" ("BIS") department by 2006, and they both held that position until the end of 2010. As Project Coordinators, Ditty earned $68,470 per year and Peterson earned $73,052 per year. (Rasmus Decl. [Docket No. 23], Ex. 3.)

Plaintiffs' work as Project Coordinators consisted mostly of "Install, Move, Add, and Change" ("IMAC") functions. They assisted employees moving from one workstation to another by creating "tickets" which instructed and coordinated other workers who would perform the work required for the move. (Ditty Dep., Boggs Aff. [Docket No. 15.], Ex. 4 at 34-40; Peterson Dep., Boggs Aff., Ex. 7 at 33-36.) They also performed other customer service, training, coordination, and billing functions.

### A.    The BIS Reorganization

In July 19, 2010, BIS submitted a proposal to the City Council's Ways and Means Committee to expand BIS's contractual relationship with Unisys—a company which already provided the City with other information technology

services.  BIS proposed outsourcing Plaintiffs' IMAC functions to Unisys in order

to realize significant savings for the City.  The proposal was approved by the

Ways and Means Committee, and the City Council subsequently approved the

new Unisys contract in August 2010.

### B.    Plaintiffs' Transition to New Jobs

In October 28, 2010, the City informed both Plaintiffs via letter that their

positions were to be eliminated effective January 1, 2011 in order to realize

"significant streamlining, cost reduction and organizational change."  (Boggs

Aff., Exs. 19-20.)   The City informed Plaintiffs that they would be placed in the

City's "Job Bank" for 60 days beginning November 1, 2010, during which time

the City would attempt to find them alternative positions.  (Id.)

While in the Job Bank, Plaintiffs sought several jobs.  The City deemed

them unqualified for some jobs, but Plaintiffs both found work through the Job

Bank.  Ditty interviewed for, and obtained, a Street Operations Specialist position

in the Public Works Department.  This position pays $59,338 per year.  (Rasmus

Decl., Ex. 3.)  Peterson applied for, and obtained, employment as a Development

Coordinator I position in the City's Regulatory Services Department.  That

position pays $58,467.  (Id.)  While both Plaintiffs experienced salary cuts ($9,132

in Ditty's case and $14,585 in Peterson's case), both were continuously employed by the City as they transitioned from their old positions to the new ones.

**C.     The City's Actions after the Elimination of Plaintiffs' Positions**

The City contends that it has realized significant cost savings as a result of the elimination of Plaintiffs' Project Coordinator positions.  While the City previously paid Plaintiffs' salary and benefits amounting to $184,000, it now pays Unisys $84,000 to complete the same IMAC tasks.  (Cousins Supp. Aff. [Docket No. 25] ¶ 11.)  Plaintiffs contend that these numbers are misleading, because a large proportion of their salaries were paid by fee for service functions for which BIS was compensated.  The City responds that its savings are still substantial when considering that factor.  Accounting for the fees paid to BIS for IMAC services, the cost to BIS during 2010 was $87,451.  (Id. at ¶ 14)  During 2011 (when Unisys took over those functions) that cost dropped to $8,554.  (Id.)  Although Plaintiffs generally object to the notion that the City has seen "cost savings associated with the elimination of [their] positions" they do not cite to record evidence contradicting the evidence submitted by the City.

Plaintiffs also contend that their positions were "re-created under another name" and that they were unfairly kept from applying for that new position.

4

Along with Plaintiffs, a third City employee who held the Project Coordinator

title also had her position eliminated at the end of 2010.  That third employee had

the same title as Plaintiffs but had a different role and job functions.  (Cousins

Dep., Rasmus Decl., Ex. 6 at 31:1.)  BIS created a new "Interagency Coordinator"

position to which the third employee was "detailed" in a temporary capacity.

(Cousins Dep. at 31-35.)  The third employee remained in the position when it

was subsequently converted into a permanent position.  Because it was originally

a temporary position into which an employee could be "detailed" or appointed,

and because the permanent position was posted after Plaintiffs had accepted

other jobs in other departments, Plaintiffs did not have an opportunity to apply

the Interagency Coordinator position.  (Id.)  The posting for that position also

required a "bachelor's degree in computer science, business or related field or

equivalent" and "experience managing projects through the Systems

Development Life Cycle," qualifications which Plaintiffs did not possess.

(Cousins Supp. Aff. ¶¶ 24, 27.)   The City contends that "no single duty of the

[Interagency Coordinator Position] overlapped with any of the duties formerly

performed by [Plaintiffs]."  (Id. ¶ 28.)

## B. Plaintiffs' Complaint

In their complaint, Plaintiffs alleged a number of violations of Minnesota law (Counts I-V) and of the United States Constitution (Counts VI-VIII). Plaintiffs have withdrawn their state law claims and now pursue only their federal claims: violation of procedural due process (Count VI), violation of substantive due process (Count VII), and violation of equal protection (Count VIII). They further ask for an award of attorney fees under 42 U.S.C. § 1983 (Count IX).

## III. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no genuine dispute as to any material fact. <u>Id.</u> at 323. Summary judgment is appropriate only when "there is no dispute of fact and where there exists only one conclusion." <u>Crawford v. Runyon</u>, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." Id. "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

**B.     "Official Policy" under 42 U.S.C. § 1983**

A plaintiff may sue a local government unit for a constitutional deprivation under 42 U.S.C. § 1983, but only where the challenged action was made pursuant to an "official policy" of the government. See Monell v. Dep't of Social Servs., 436 U.S. 658, 690-91 (1978).   As the Supreme Court has explained:

> [I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy.

Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986)

The City argues that Plaintiffs have not sufficiently shown that any official act or policy caused their alleged injury.  In response, Plaintiffs note that the elimination of their positions was pursuant to the outsourcing plan submitted to, and approved by, the City Council.

This Court has found "official policy" in a case where the City's reorganization plan was approved by the Ways and Means Committee and then adopted by the full City Council.  Dosdall v. City of Minneapolis, Civ. No. 05-498 (JRT/FLN), 2007 WL 14354, at *2 (D. Minn. Jan. 3, 2007).  The facts with respect to this issue are very similar to those in Dosdall, and as in Dosdall, the Court here concludes Plaintiffs' positions were eliminated pursuant to the City's official policy.

C. **Procedural Due Process Claim (Count VI)**

Plaintiffs allege that the City deprived them of their property rights without due process of law in violation of the Fourteenth Amendment.  Plaintiffs must make a showing on two elements to succeed on such a procedural due process claim.  First, Plaintiffs must show that they were deprived of some "life, liberty or property" interest.  Krentz v. Robertson Fire Prot. Dist., 228 F.3d 897,

902 (8th Cir. 2000).  If successful, Plaintiffs must then show that they were deprived of that interest without sufficient process.  Id.

The parties dispute whether Plaintiffs had a constitutionally recognized property interest in retaining their positions under the relevant circumstances. Such interests are created by state law, and public employees whose employment contracts cannot be terminated except for good cause generally have such an interest.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39 (1985).

Of course, the facts here are not quite the same as a typical case because Plaintiffs were never fully terminated by the City.  See id. at 535 (noting that public employer "discharged" employee); Krentz, 228 F.3d at 902 (noting that the second stage of a procedural due process claim under Loudermill is that "the employer actually fires the employee").  Here, as result of their and the City's efforts, Plaintiffs found alternative employment with the City and were never actually fired.  The employment action taken against Plaintiffs might be more accurately characterized as a reassignment or demotion.  The right asserted by Plaintiffs is not merely a right to continued employment, but a right to continued employment in the same position or at the same pay level.  The Eighth Circuit has nonetheless indicated that process may be due in such a case.  See Lindner v.

Nebraska, 12 Fed. App'x 429, 431 (8th Cir. 2001) (per curiam) (unpublished) (addressing adequacy of process where public employee was demoted but not fired).

Assuming without deciding that Plaintiffs have established a cognizable property interest, the Court concludes that an exception applies in this case and bars Plaintiffs' due process claims. Courts have consistently acknowledged that an exception to general due process requirements applies when an employee's position is eliminated as a result of a bona fide layoff, reduction in force, or reorganization. "[P]re-termination hearings are not required by due process where a bona fide government reorganization plan bases dismissals on factors unrelated to personal performance." Rodriguez-Sanchez v. Municipality of Santa Isabel, 658 F.3d 125, 130 (1st Cir. 2011) (explaining that "[b]ecause such a plan is aimed at positions of employment rather than at individual employees, a pre-termination hearing would be a futile exercise."); see also Gunville v. Walker, 583 F.3d 979, 989 (7th Cir. 2009) ("[D]ue process is not implicated when government employees are laid off due to a reorganization.").

This "reorganization exception" has been "extensively developed [in Minnesota law] in cases under the Veterans Preference Act." Dosdall, 2007 WL

14354, at *3; see Loudermill, 470 U.S. at 538 (property interests protected by procedural due process are creations of state law).  "Under this line of cases, a public employer may legally abolish a position and remove a veteran if the actions were taken in good faith and were 'not a mere subterfuge to oust him from his position.'"  Dosdall, 2007 WL 14354, at *3 (quoting State ex rel. Boyd v. Matson, 193 N.W. 30, 32 (Minn. 1923)).  A sham reorganization—one undertaken in bad faith or which merely reassigns a plaintiff's job duties to another employee—does not qualify for the reorganization exception.  See Young v. City of Duluth, 386 N.W.2d 732, 737-38 (Minn. 1986); Herstrom v. Park and Recreation Bd., 248 N.W.2d 327, 328 (Minn. 1976).

It is undisputed that Plaintiffs' positions were eliminated pursuant to a reorganization plan approved by the City Council.  The dispositive question here, then, is therefore whether a genuine issue of material fact remains as to whether the City's reorganization of the BIS department was illegitimate.  Plaintiffs advance three arguments for why the elimination of their positions was a sham.  First, they argue that BIS reassigned their job functions to other BIS employees.  Second, and relatedly, they argue that BIS essentially re-created their positions in the form of the new Interagency Coordinator position.  Third,

Plaintiffs argue that the elimination of their positions was not in good faith

because the City did not actually realize the cost savings that it used as a

justification for the reorganization.

### 1. Reassignment of Job Functions

In support of their first contention—that their duties have been reassigned

within BIS—Plaintiffs point to the deposition testimony of BIS administrator Beth

Cousins. Cousins stated that some aspects of the extended agreement with

Unisys had not been "completely leveraged yet." (Cousins Dep. at 13-15.) In

particular, a new software module which would allow an end-user "customer"

to create their own IMAC ticket had not been "deployed" as of September 2011.

(Id. at 15:4-16:1.) Plaintiffs argue that this testimony provides evidence that BIS

had not yet fully outsourced their job functions nearly a year after their positions

were eliminated.

The City notes that no BIS employees have taken over Plaintiffs' IMAC

roles and that Plaintiffs have not pointed to any evidence in the record which

could support a contrary finding. Moreover, the City argues that even if some of

Plaintiffs' roles were reassigned, mere reassignment of some roles is not

sufficient to show that the elimination of Plaintiffs' positions was done in bad

faith.  In a different context, the Eighth Circuit has held that the fact that remaining employees have taken over <u>part</u> of a terminated employee's duties does not on its own establish a prima facie case of discrimination.  <u>See</u> <u>Ward v. Int'l Paper Co.</u>, 509 F.3d 457, 462 (8th Cir. 2007).  The logic of <u>Ward</u> applies in a layoff context; some job functions are necessary for the organization's work, and it is not surprising that, when a position is eliminated, that some of the functions from that position would be reassigned to remaining employees.  Such an outcome does not on its own imply that decision to eliminate the position was made in bad faith.

While the record indicates that there has been some delay in Unisys's deployment of a particular software module, Cousins has also stated that "Unisys still took over the IMAC functions and continued to use the prior existing software in relation to IMAC functions."  (Cousins Supp. Aff. ¶ 9.) Testimony by another BIS manager also confirms that the IMAC functions previously performed by Plaintiffs are now handled by Unisys.  (Filigenzi Dep. [Rasmus Decl., Ex. 7] at 30:9-12.)   The mere fact that the new computer software was not functional as of September 2011 could not lead a reasonable fact finder to conclude that Plaintiffs' job functions were reassigned to other BIS employees,

and Plaintiffs present no additional evidence to advance that proposition. The

Court therefore cannot conclude that the evidence—viewed in the light most

favorable to Plaintiffs—could support a finding that the City reassigned all of

Plaintiffs' job functions to one or more BIS employees.

### 2. Re-creation of Plaintiffs' Positions

Plaintiffs next argue that the newly created Interagency Coordinator

position re-created their eliminated positions. In Plaintiffs words, that position

was "created out of the ashes of project coordinator positions." (Pls.' Mem. in

Opp'n at 15.) In support, Plaintiffs cite to deposition testimony of Beth Cousins,

in which she allegedly "acknowledged that work performed by Plaintiffs as

project coordinators was very similar to duties assigned to the newly created

interagency coordinator position." (Id. at 5-6.) The deposition excerpts

referenced by Plaintiff, however, does not support that assertion or mention the

Interagency Coordinator position at all—it simply outlines the responsibilities

undertaken by Plaintiffs' as project coordinators. (Cousins Dep. at 13-16.)

Moreover, Cousins testified that even when Plaintiffs and the employee who

now holds the Inter-Agency Coordinator position had the same job title, their

responsibilities and roles were different. (Id. at 30:24-31:1.) Plaintiffs point to

Ditty's deposition testimony to support the assertion that the eliminated and the newly created positions were similar. (Pls.' Mem. in Opp'n at 6.) The testimony cited, discusses the fact that Ditty had previous experience overseeing implementation of projects beyond her IMAC functions. (Ditty Dep. at 111-112.) Ditty does not allege, however, that the new Interagency Coordinator position performs IMAC functions.

Plaintiffs compare their case to that at issue in <u>Dosdall</u>. While it is true that the plaintiffs in <u>Dosdall</u>, like Plaintiffs here, had their positions eliminated by the City, there the similarities to that case end. The plaintiffs in <u>Dosdall</u> presented evidence (in the form of deposition testimony by a City manager) that newly created positions in the department were "identical" to the positions which had been eliminated. 2007 WL 14354, at *3. The Court concluded that such a fact, if proven, could give rise to a conclusion that the elimination of the positions had been part of a "sham" reorganization. <u>Id.</u> The Court therefore declined to grant summary judgment in favor of the City on the plaintiffs' procedural due process claim. <u>Id.</u> Here there is no similar testimony or evidence. It is undisputed that the new Interagency Coordinator position does not have the same responsibilities as the eliminated Project Coordinator positions, and there is no

evidence indicating that the new position is identical or even substantially similar to the old ones.

### 3. Costs Saved

Plaintiffs next argue that the reorganization could not have been undertaken in good faith because the City has not realized the savings predicted when the reorganization was proposed. While Plaintiffs "contend that the City has seen no cost savings" they do not point to evidence in the record to support that assertion. (Pls.' Mem. in Opp'n at 6.) The only evidence in the record as to the savings by the City is that submitted by the City. That evidence indicates that the City realized considerable savings by outsourcing IMAC functions from BIS to Unisys, even after considering the fees recouped by BIS during Plaintiffs' tenure. (Cousins Supp. Aff. ¶¶ 11, 14.) Plaintiffs have not presented evidence which reasonably challenges the validity of the City's accounting.

In the absence of evidence tending to undermine application of the reorganization exception, Plaintiffs' claims against the City cannot succeed. Undisputed evidence indicates that the City's reorganization was not a sham, but was aimed at legitimate cost-saving goals. Thus, Plaintiffs were not entitled to procedural due process protections, even if they could show that they had

constitutionally protected interests in maintaining their particular jobs and salaries. For the above reasons, the Court will grant summary judgment to the City as to Plaintiffs' procedural due process claims.

### D.    Substantive Due Process Claim (Count VII)

"To state a substantive due process claim, [Plaintiffs] must allege that a government action was 'sufficiently outrageous' or 'truly irrational,' that is, something more than . . . arbitrary, capricious, or in violation of state law." Young v. City of St. Charles, 244 F.3d 623, 628 (8th Cir. 2001) (quoting Anderson v. Douglas Cnty., 4 F.3d 574, 577 (8th Cir. 1993)). As the Eighth Circuit has recently noted, "[t]his is a high standard." Christiansen v. W. Branch Cmty. Sch. Dist., 674 F.3d 927, 937 (8th Cir. 2012).

Plaintiffs advance several arguments in support of their assertion that the City's action shocks the conscience. See id. First, they argue—as above—that the City's purported reason for the reorganization was pretext because the City did not realize the savings which it had projected. As already discussed, the only evidence in the record with respect to this issue indicates that the City actually did realize significant savings from the outsourcing of Plaintiffs' functions to Unisys. Moreover, the Court finds that the fact that a City reorganization plan

realized fewer savings than anticipated could not shock the conscience of any reasonable fact finder.

Second, Plaintiffs argue that the decision to eliminate their positions was "outrageous and truly irrational" because BIS continued to hire other employees after eliminating Plaintiffs' positions. This, Plaintiffs argue, shows that BIS had a budget sufficient to keep them in their positions. The City points out, however, that the jobs added by BIS—software engineer and other positions—were unrelated to Plaintiffs' job functions. There is nothing inherently outrageous or irrational in eliminating positions in one area of expertise and adding them in another.

Third, Plaintiffs argue that the City's decision was "truly irrational" because, in response to a hypothetical question, a City manager testified that it might have made sense to eliminate only one of the two positions. The Court concludes that no reasonable fact-finder would find, based on that testimony, that the decision to eliminate two positions, rather than one, was "outrageous and truly irrational."

In sum, even when viewing the evidence in the light most favorable to Plaintiffs, the Court finds no basis for Plaintiffs' allegations of outrageousness,

true irrationality, or conscience shocking conduct.  The Court finds it beyond

dispute that the City's actions were not "something more than . . . arbitrary,

capricious, or in violation of state law."  Young, 244 F.3d at 628.  Plaintiffs cannot

meet the high standard necessary for succeeding on their substantive due

process claims, and the Court must therefore grant the City summary judgment

as to those claims.

> **E.     Equal Protection Claim (Count VIII)**

Plaintiffs do not allege that they are members of a distinctive or protected

class of individuals.  They instead make what has been termed as a "class of one"

equal protection claim.  See Engquist v. Oregon Dep't of Agric., 553 U.S. 591, 597

(2008).  Plaintiffs argue that the City violated their equal protection rights by

acting without a rational basis and "treating them with . . . animus" and

differently than "similarly situated employees."  (Pls.' Mem. in Opp'n at 21.)

Their claim is nearly identical to that asserted by the plaintiff in Engquist, who

argued, unsuccessfully, "that the Equal Protection Clause forbids public

employers from irrationally treating one employee differently from others

similarly situated, regardless of whether the different treatment is based on the

employee's membership in a particular class."  553 U.S. at 597.   The Supreme

Court has flatly rejected such reasoning, explaining:

> If . . . plaintiffs need not claim discrimination on the basis of
> membership in some class or group, but rather may argue only that
> they were treated by their employers worse than other employees
> similarly situated, any personnel action in which a wronged
> employee can conjure up a claim of differential treatment will
> suddenly become the basis for a federal constitutional claim.
> Indeed, an allegation of arbitrary differential treatment could be
> made in nearly every instance of an assertedly wrongful
> employment action—not only hiring and firing decisions, but any
> personnel action, such as promotion, salary, or work assignments—
> on the theory that other employees were not treated wrongfully.

Id. at 607-08; see Mathers v. Wright, 636 F.3d 396, 399-400 (8th Cir. 2011) (noting

that the Supreme Court has "concluded that class-of-one claims are not

cognizable in the context of public employment").

    While the City raised Engquist's clear holding in its opening

memorandum, Plaintiffs have left the City's argument unaddressed in their

opposition.  Even if Plaintiffs were to assert that they are not a "class of one" but

are rather a "class of two"—which they have not—the reasoning from Engquist

would apply with the same force.  Plaintiffs simply argue that, by being

wrongfully treated, they were treated differently from similarly situated

employees who were not wrongfully treated.  The Supreme Court's decision in

Engquist clearly forecloses a claim based on this tautological assertion. The

Court must therefore grant summary judgment in the City's favor with respect to

Plaintiffs' equal protection claim.

Accordingly, based on the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendant City of Minneapolis's Motion for Summary

Judgment [Docket No. 12] is **GRANTED**. This action is hereby **DISMISSED**

with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   September 6, 2012                      s/ Michael J. Davis
                                               Michael J. Davis
                                               Chief Judge
                                               United States District Court